IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| vs. | § | No. A-13-CR-458 DEW |
| | § | |
| FRANCISCO AGUSTIN | § | |
| COLORADO-CEBADO (2) | § | |

### ORDER

Before the Court is the Government's Motion for Detention (Dkt. No. 5), Francisco Colorado-Cebado's Request for Bail (Dkt. No. 26), the United States' Response to Defendant's Request for Bail (Dkt. No. 45), Francisco Colorado-Cebado's Reply Concerning His Request for Bail (Dkt. No. 46), the United States' Supplemental Response to Defendant's Request for Bail (Dkt. No. 47), and Colorado-Cebado's Reply to the Supplemental Response (Dkt. No. 49).

In its original motion, the United States sought detention of Colorado-Cebado, contending he posed a serious risk of flight. Both orally in open court, and in its response and supplement, the Government expanded the grounds for detention to include the allegation that Colorado-Cebado's release would pose a risk of danger to the community. *See* United States' Response at 1 (Dkt. No. 45). In accordance with the Bail Reform Act, a detention hearing was held on October 7, 2013, at which the parties presented testimony and legal argument. In addition to the evidence and arguments presented at that hearing, I have considered the briefing of the parties and the additional materials presented with that briefing, as well as the report of the Pretrial Services Office. Based on all of the above, I conclude by a preponderance of the evidence that there are no conditions I could set that would reasonably assure Colorado-Cebado's appearance as required, and will therefore order that he be detained pending trial in this case.

Colorado-Cebado is charged by indictment with conspiring to bribe a public official, in violation of 18 U.S.C. § 371, and bribery of a public official, in violation of 18 U.S.C. § 201. In brief, the indictment alleges that the he, in concert with others, conspired to, and actually did, offer to pay $1.2 million to a United States District Judge in exchange for a reduced sentence for his father, Francisco Colorado-Cessa, who on May 9, 2013, was convicted by a jury of conspiring to commit money laundering, and sentenced on September 6, 2013, to 20 years of imprisonment.

Colorado-Cebado is a 25 year-old citizen of Mexico. At the time of his arrest he was residing in Mexico, but he has regularly traveled from Mexico to visit his father since the time of his father's arrest and detention in 2012. He was present in the United States on a tourist visa when arrested, but that visa has since been revoked. His step-mother and half-brother live in Houston, though they do not have residency in the United States, but rather are on immigration bonds pending rulings on asylum petitions. As noted, Colorado-Cebado's father is in the custody of the U.S. Marshal awaiting trial on the instant case, and as a result of his conviction on the money laundering charge. The remainder of Colorado-Cebado's immediate family, including his mother and grandmother (with whom he resides), live in Poza Rica, Veracruz, Mexico. He has resided in the United States on two occasions—first, for three months in 2007 in Houston, and then for approximately one year in 2009 in Edinburg, to study English it appears. It is unclear how, if at all, Colorado-Cebado is currently employed, other than assisting in the continued business dealings of his father, as detailed below. He informed the Pretrial Office that he was a student, though he declined to elaborate on that. His step-mother told the Pretrial Office that he is an engineering student in Monterrey, Mexico. Colorado-Cebado, however, told the officer that he resides in Poza Rica, which is approximately 450

miles from Monterrey. The Court was presented no tangible evidence that Colorado-Cebado is enrolled in any courses at any college in either the United States or Mexico.

Before focusing on the specifics of this case, a few preliminary notes are appropriate. As Colorado-Cebado points out, the Bail Reform Act begins with the general presumption that a defendant will be released at his initial appearance. Unless more is required to assure the defendant's appearance or the public's safety, the release must be on the defendant's own recognizance. If not on his own recognizance, the person is to be released on the minimum conditions necessary to ensure his appearance and the public's safety. And only when there is no combination of conditions that would reasonably assure a person's appearance or the public's safety may the person be detained. Further, a person's immigration status (or more accurately, his lack of status) is not an impediment to release. Rather, when—as here— a defendant is not a citizen or permanent resident of the United States, the detention hearing is delayed for up to 10 days to allow the immigration authorities time to initiate removal proceedings if they so desire. But if officials "fail[ ] or decline[ ] to take such person into custody during that period," then the court is directed to treat the defendant "in accordance with the other provisions of [the Bail Reform Act], notwithstanding the applicability of other provisions of law governing release pending trial or deportation or exclusion proceedings." 18 U.S.C. § 3142(d). In other words, a non-citizen, non-resident defendant who is not taken into custody by immigration authorities is to be treated like any other defendant for release purposes. This does not mean, however, that a court is prohibited from considering the defendant's immigration status or nationality as one of the factors in its analysis, as the Act directs the judge to consider the "history and characteristics of the person," including his "length of residence in the community" and "community ties." *Id.* at § 3142(g)(3)(A).

Applying these legal principles here is a bit different than usual, however, given Colorado-Cebado's release proposal.  He asks that the Court release him into the custody of a private security firm, to be held under armed guard in an extended stay-type hotel or apartment.  He would only be permitted to leave when approved by the Pretrial Office, and then still under guard and with a GPS monitor.  He would have restrictions on his internet access and phone usage (incoming and outgoing calls only as approved), and only have visitors as approved by the Pretrial Office, with notice to the Government.  An ordinary 25 year-old student would not make such a proposal.

And Colorado-Cebado is not an ordinary 25 year-old.  As noted earlier, his father, Francisco Colorado-Cessa, was convicted in May on a money laundering charge.  The jury in that case found that Colorado-Cessa had conspired to launder monies that were the fruits of the distribution of controlled substances, extortion, and bribery.  *See* Jury Verdict in A-12-CR-210 SS (Dkt. No. 555).  The evidence presented to support these charges was that the monies at issue in that case—tens of millions of dollars—derived from the Los Zetas Mexican drug cartel, and that Colorado-Cessa's Mexican company (ADT Petroservicios) operated as a conduit for the laundering of drug proceeds from the cartel's criminal operations.  The Government has frozen, and has since had forfeited to it, over $25 million from Colorado-Cessa's UBS account in the United States, as well as two jet airplanes owned by ADT Petroservicios.  A $60 million money judgment was also imposed against Colorado-Cessa based on the conviction.  In short, Colorado-Cebado's father—who Colorado-Cebado has visited regularly since his arrest—is a multi-millionaire with documented strong ties to Los Zetas, and has been convicted of laundering large sums of money for Los Zetas.  Colorado-Cebado cautions me not to conclude from such evidence that he is guilty of the charged bribery offenses, and urges me not to make him suffer for the sins of his father.  That is not my intention.

4

As he correctly notes, the law does not permit a finding of guilt based on who one associates with. *E.g., United States v. Singleterry*, 646 F.2d 1014, 1018 (5th Cir. 1981) (reciting the "long established rule that a defendant's guilt may not be proven by showing that he associates with unsavory characters"). Of course, at this point Colorado-Cebado is presumed innocent, so his guilt is not really a consideration. Rather, at this stage of the proceedings the question focuses on his risk of flight and any danger he poses to the community if released. And on those issues, Colorado-Cebado's associations *are* relevant factors for the Court to consider. As noted earlier, the Bail Reform Act instructs courts to consider an individual's history and characteristics in deciding whether to set conditions of release. As Judge Seyla stated in *United States v. Tortora* (cited by the Government), considering a person's Mafia ties in the context of a bail hearing is allowed, since doing so is judging the person "as he should be, as an individual, with one relevant characteristic being his devotion to the Mafia and his pledge to violate the law whenever necessary to further its end." *United States v. Tortora*, 922 F.2d 880, 885 n.6 (1st Cir. 1990). As Colorado-Cebado notes, there is no evidence here that he is as devoted to Los Zetas as Tortora was to the Mafia. I agree, but the general principle of *Tortora* remains relevant: the risks of releasing the person are to be judged based on the individual, and all of his characteristics. Here, that means that I cannot turn a blind eye to the evidence of Colorado-Cebado's devotion to his father, and the inferences I can draw when I take that devotion together with the evidence regarding his father's criminal business career.

Moreover, it is not simply the fact that Colorado-Cebado's father has strong ties to Los Zetas that causes me concern when I evaluate the risks Colorado-Cebado poses if released. Another reason that the father's criminal ties and conduct are relevant is that Colorado-Cebado is accused of attempting to (criminally) extricate his father from the very legal problems his father's crimes have

caused him. In a very real sense, Colorado-Cebado's alleged criminal acts are an extension of Colorado-Cessa's money laundering. The alleged act of conspiring to bribe the judge presiding over his father's prosecution, taken together with the evidence that the Government presented at the detention hearing, as well as the evidence submitted with the Government's most recent supplement, demonstrates there are good reasons to suspect it is not just the father who has ties to Los Zetas, and that Colorado-Cebado employed ties with Los Zetas in the bribery scheme charged here—all of which makes his father's actions illuminating regarding the risks Colorado-Cebado might pose if he were to be released.[1] Further, the evidence makes it highly likely, if not demonstrated, that Colorado-Cebado has access to ADT Petroservicio's assets and monies, as well as that company's affiliations, which are documented to include affiliations with Los Zetas. How that business has been operated in the past is relevant to evaluating how it might be used by Colorado-Cebado in the future.

Colorado-Cebado's counsel plainly recognizes all of this, and tacitly concedes its impact, as demonstrated by the highly unusual release proposal he has presented to the Court. The primary elements of that proposal are that all of the following would be required:

---

[1] In his most recent filing, Colorado-Cebado posits that the text message submitted with the Government's last filing, and referred to here, relates to an innocent business transaction, somehow involving an "Omar" and a "Miguel" who are associates of Carmen Aristegui, a journalist and "one of the most important opinion leaders in Mexico." Dkt. No. 49 at 2. That may be the case, but there is little on which to base that conclusion, other than Colorado-Cebado's assertion. Aristegui is the anchor of a CNN en Español news program. CNN describes the program as "featuring in-depth conversations with Mexican leaders from an array of fields including politics, government, business, literature and entertainment." http://www.cnn.com/CNN/anchors_reporters/aristegui.carmen.html (last visited October 28, 2013). Colorado-Cebado offers no explanation of what type of business transaction he would be engaged in with the CNN news anchor, and why it would involve "pressuring" Miguel, or telling Omar not to be a "dick" to "Aristegui's people."

- Armed security guard at Defendant's place of temporary residence, 24 hours a day, 7 days a week.

- Defendant must consent in writing to the use of reasonable force to thwart any attempt to flee.

- Defendant must wear electronic or GPS tracking device.

- Pretrial Services must approve all visitors to Defendant's residence. All visitors must be searched by on-duty security guard.

- Restricted internet and/or telephone access.

- Defendant may not leave residence except for meetings with counsel, court appearances, religious services, medical appointments, etc. Armed guard must be present with Defendant when he leaves. Defendant may leave the residence only with prior approval of Pretrial Services.

- Pretrial Services will conduct random, unannounced visits

Request for Bail (Dkt. No. 26) at 7.  As he notes in this filing, several courts have either imposed or considered like conditions in cases involving extremely wealthy defendants (Marc Dreier, Bernard Madoff), and organized crime defendants (Frank Locascio).  Dkt. No. 26, Exh. 4-8; *United States v. Locascio*, 776 F.Supp. 666, 672 (E.D.N.Y. 1991).  As Judge Glasser noted in *Locascio*, such proposals "elaborately replicate a detention facility."  Colorado-Cebado himself refers to his proposal as "effectively creat[ing] a virtual prison."  Dkt. No. 46 at 1.

Returning to fundamentals, the Bail Reform Act instructs courts to consider four primary factors in deciding whether to set conditions of release:  (1) the nature and circumstances of the charged offense; (2) the weight of the evidence against the person; (3) the history and characteristics of the person; and (4) the nature and seriousness of the danger to the community presented by the person's release.  18 U.S.C. § 3142(g)(1)-(4).

The nature and circumstances of the crime here do not favor release. Colorado-Cebado is charged with attempting to subvert the criminal justice process by bribing the judge presiding over his father's trial and sentencing. The nature and circumstances of this charge counsel against release, as release is by definition dependent on the willingness of the released person to follow the law and the rules set by the court. The charge suggests the contrary. The weight of the evidence against Colorado-Cebado is also a negative factor for release. The evidence presented at the detention hearing demonstrated that there were several meetings involving Colorado-Cebado and the undercover agents in which he expressed a willingness and the desire to pay a bribe to the sentencing judge in return for a reduced sentence for his father. The majority of the meetings were recorded. Further, while Colorado-Cebado was not involved in as many meetings as his co-defendant Segura-Flores, the evidence suggests that Colorado-Cebado, in consultation with his father, was the decision-maker, and was directing Segura-Flores' actions.

Colorado-Cebado's history and characteristics have already been discussed in part in some detail. To expand on that discussion, Colorado-Cebado's ties to this community (and the United States) are not strong. While his step-mother and brother reside in Houston, there is no evidence suggesting that he is close to either. He does not reside with his step-mother in Houston, but rather told Pretrial Services that he resides with his biological mother in Mexico. Moreover, while his step-mother and brother are seeking asylum in the United States based on drug cartel violence, Colorado-Cebado has not joined in those petitions. And while a family friend (a high school classmate of Colorado-Cessa), testified that he would be willing to post his home in Edinburg, Texas as collateral to secure Colorado-Cebado's appearance, he admitted that he did not have strong ties to Colorado-Cebado, and was unaware of the facts which led to Colorado-Cessa's conviction. Colorado-Cebado

does not appear to have any other ties with this forum. Moreover, there was evidence submitted at the hearing that since his father's incarceration, Colorado-Cebado has been actively assisting his father with business dealings, presumably with the father's Mexican business, ADT Petroservicios. This creates yet another tie between Colorado-Cebado and Mexico, as that business is located and operates in Mexico, not the United States. ADT appears to be all that the family has left after Colorado-Cessa's conviction, and thus Colorado-Cebado has a significant interest in at least maximizing its value, if not keeping it operating. Considering the nature and circumstances of the charged offense, the strength of the Government's case, and Colorado-Cebado's history and characteristics, I conclude that Colorado-Cebado poses a serious risk of flight if released.

      Finally, there is the risk to public safety—"the nature and seriousness of the danger posed to any person or the community," to use the statutory language—presented by Colorado-Cebado's release. This is a more difficult factor to evaluate. Colorado-Cebado has no apparent criminal background or history of violence. At the same time, the organization with which he appears to have ties—Los Zetas—has a documented history of violence. Candidly, while I believe the evidence supports the belief that Colorado-Cebado has access to his father's criminal connections and assets (as discussed in more detail above), it is difficult to determine the strength of these ties, as they are not something either the person or the criminal enterprise would ordinarily discuss publicly. Regardless, there is at least probable cause to believe that Colorado-Cebado has inherited some of his father's connections to Los Zetas. And given the organization's history, there is cause to be concerned about community safety if Colorado-Cebado is released into a "virtual prison," and then uses ties to Los Zetas to attempt to escape. Further, the release proposal calls for 24 hour armed guards securing Colorado-Cebado, with those guards being authorized to use force if necessary to

keep Colorado-Cebado detained. This itself poses a danger to the community, in that it creates the possibility of violence occurring should Colorado-Cebado seek to escape, and given further that none of the proposed detention locations are private, secure facilities. Thus, while I do not believe that the release of Colorado-Cebado on typical pretrial supervision conditions would be likely to create a risk to the community, I do believe that the release proposal he has made does create such a risk. And given the serious flight risk he poses, releasing Colorado-Cebado on less restrictive conditions—which would reduce the public safety risk—would increase the flight risk unacceptably.

All of which brings me back to a common theme: Colorado-Cebado appears to concede that he presents such a serious risk of flight that releasing him on anything approaching a more ordinary set of conditions (surety bond, monitoring, reporting) is not adequate to reasonably assure his appearance. Regardless of whether he intends to convey this message by his proposal, for the reasons already discussed, I conclude that he does indeed pose such a risk. But if a person poses such a risk of flight that, to prevent him from fleeing, he must be locked up and detained by armed guards authorized to use force, is that not a situation in which there are no conditions I can set that would reasonably assure the person's appearance? From the standpoint of ensuring the person's appearance, what is the difference between Colorado-Cebado's release proposal and detention?

Colorado-Cebado's answer to this question is that because it is possible to create a "virtual jail" through a "combination of conditions," the Bail Reform Act mandates that his proposal be implemented in lieu of detention.[2] This argument suggests that so long as a person possesses

---

[2] I asked something like this question at the detention hearing, and Colorado-Cebado addressed it in his reply brief (Dkt. No. 46, at 1-3). In addition to the argument discussed in the text above, he also argues that his proposal provides more convenience and comfort than routine detention. That is, detention in Houston, in not-quite-full-jail conditions, would be more convenient for counsel to meet with his client, and for the client to review the evidence against him, and also

sufficient resources to propose a virtual jail, there would never be a situation in which detention is permitted. Indeed, I imagine that even Hannibal Lecter could propose adequate release arrangements to secure his appearance and the public's safety if he had the financial resources to do so. While it seems to me that neither the Constitution nor the Bail Reform Act demands such a result, courts are not in agreement on this point. Several courts, while noting the seeming financial discrimination such a position creates, have nonetheless concluded that the entry of extraordinary bond conditions for those who can afford them is permissible, if not required. For example, in *United States v. Dreier*, Judge Rakoff noted that:

> It cannot be gainsaid that many kinds of bail conditions favor the rich, and conversely, that there are many defendants who are too poor to afford even the most modest of bail bonds or financial conditions of release. This is s serious flaw in our system. But it is not a reason to deny a constitutional right to someone who. for whatever reason, can provide reasonable assurances against flight.

*United States v. Dreier*, 596 F.Supp.2d 831, 833 (S.D.N.Y. 2009). *See also United States v. Sabhnani*, 493 F.3d 63, 78 n.18 (2d Cir. 2007) (declining to address the specific issue as it was not raised by the parties, but noting that "in the instant case, defendants of lesser means, lacking the resources to flee, might have been granted bail in the first place."); *United States v. Patriarca*, 948 F.2d 789, 794 (1st Cir. 1991) (permitting release on conditions financed by defendant, finding that because *he* could afford the expenses, the government was not being forced to engage in "heroic" measures). On the other side of the issue, many courts have found such a result repugnant. As Judge Parker of the District of New Mexico recognized,

---

would provide Colorado-Cebado more comfort, and slightly more freedom, than a county jail would provide. Convenience and comfort, while not insignificant considerations, are not factors that the Court need consider at this time, as Colorado-Cebado is not contending that detention in a county jail would subject him to unconstitutional conditions.

>the concept advanced by the First Circuit's opinion in *Patriarca*—that a defendant can buy his pretrial release if he has sufficient funds to finance the creation of a private jail at his home—is repugnant to a court's sense of justice.

*United States v. Lee*, 79 F.Supp.2d 1280, 1289 (D.N.M. 1999). Similarly, in *Borodin v. Ashcroft*, 136 F.Supp.2d 125, 134 (E.D.N.Y.2001), Judge Nickerson concluded that "it is contrary to underlying principles of detention and release on bail that individuals otherwise ineligible for release should be able to buy their way out by constructing a private jail, policed by security guards not trained or ultimately accountable to the government, even if carefully selected."

But it is more than the financial unfairness of the result that causes me pause. If I conclude—as I do here—that the only conditions that will reasonably assure a defendant's appearance as required are that he be held under armed guard and the threat of deadly force to prevent his escape, then how does the Bail Reform Act—and its recognition that there *will* be situations in which no set of conditions are reasonable—have any meaning if I must release that defendant if he can build himself a private "virtual" prison? What more compelling case for an order of detention is there than a case in which only an armed guard and the threat of deadly force is sufficient to assure the defendant's appearance? There are some conditions that are simply not appropriate to be contracted out, and detention under armed guard would seem to be one of those. The Second Circuit appeared to recognize this in the *Sabhnani* case, when it noted in a footnote that:

>Defendants have also agreed to authorize private security officers to carry firearms while supervising their home detention. To the extent this implies an expectation that deadly force may need to be used to assure defendants' presence at trial, that conclusion finds no support in the record before this court. *Such a conclusion would, in fact, demand a defendant's detention.*

*Sabhnani*, 493 F.3d at 74 n.13 (emphasis added). When an armed guard with license to use that firearm is needed to ensure that a defendant does not flee, then conditions of release are simply not

12

appropriate, regardless of how elaborate a release proposal a wealthy defendant might construct. In sum, I conclude that there are no conditions I could set that would reasonably assure Colorado-Cebado's appearance as required.[3] I therefore GRANT the Motion for Detention (Dkt. No. 5).

### Directions Regarding Detention

The defendant is committed to the custody of the Attorney General or his designated representative for confinement in a corrections facility separate, to the extent practicable, from persons awaiting or serving sentences or being held in custody pending appeal. The defendant shall be afforded a reasonable opportunity for private consultation with defense counsel. On order of a court of the United States or on request of an attorney for the Government, the person in charge of the corrections facility shall deliver the defendant to the United States Marshal for the purpose of an appearance in connection with a court proceeding.

SIGNED this 30th day of October, 2013.

_____
ANDREW W. AUSTIN
UNITED STATES MAGISTRATE JUDGE

---

[3] Colorado-Cebado also proposed that his appearance could be secured by his father's agreement to forfeit the appeal of his money laundering conviction and sentence, as well as the orders of forfeiture and money judgment that are part of that sentence. He contends that this is valuable collateral, as his father would be relinquishing any rights in two jet airplanes, $25 million, and any hope of avoiding 20 years of imprisonment. Leaving aside the feasability of this proposal, or the value of what is being offered when it is discounted by the chances of success on appeal, I conclude that any such agreement would not be sufficient to secure Colorado-Cebado's appearance. As already noted, the future of the Colorado family lies in Mexico, with ADT Petroservicios, and any other assets the family owns there, and not with what might be here in the United States. The evidence suggests that Colorado-Cessa would willingly part with this "collateral" if it allowed Colorado-Cebado to escape from facing these charges and return to Mexico to the security and protection of the monies, business, and associations there.